UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                  )
                                        )
   LOCAL COMMUNICATIONS          )    Case No. 07-12433-SSM
   NETWORK, INC.                 )
                                        )    Chapter 7 (Involuntary)
              Debtor         )

**MEMORANDUM OPINION AND ORDER**

Before the court is the motion of the petitioning creditors, Jewell McNanley, Robert McNanley, Jr., and Elizabeth Crawford, to reconsider the order of October 18, 2007, dismissing the involuntary petition. A hearing was held on December 11, 2007, at which the court heard the contentions of the parties and took the motion under advisement. For the reasons stated, the motion to reconsider will be denied.

<u>Background</u>

The relevant facts were set forth in this court's oral findings of fact and conclusions of law made on October 17, 2007,[1] and will be repeated only to the extent necessary to provide a context for the present motion. Briefly, Local Communications Network, Inc. ("LCN") is a provider of satellite-based telecommunications services. Its founder, Robert McNanley, Sr., died in April 2007. Prior to his death, he was the chairman of the company's board of directors. Jewell McNanley is his widow, and since the filing of the involuntary petition has qualified as the executor of his estate. Robert McNanley, Jr., and Elizabeth Crawford are the son and

---

[1] A transcript of the ruling has been filed. Tr. 10/17/07 (Doc. # 45).

daughter of the founder, and until June 28, 2007, were the president and chief financial officer, respectively, of the company. On that day, both of them were orally notified that their employment had been terminated.

The present case was commenced when Jewell McNanley, Robert McNanley, Jr., and Elizabeth Crawford—asserting aggregate claims against LCN of $419,182 for unpaid salary and severance pay—filed an involuntary petition against the debtor under chapter 7 of the Bankruptcy Code on September 5, 2007. With the petition, they also filed a motion for preliminary injunction which the court treated as a motion to appoint an interim trustee. Following an evidentiary hearing on September 12, 2007, the court denied the motion for an interim trustee and set a trial of the involuntary petition for October 10, 2007. After hearing the evidence,[2] the court continued the matter to October 17, 2007, for a ruling. Although LCN was paying some of its creditors on a more or less current basis, the court found that sufficient creditors were not being paid to support a finding that LCN was not "generally" paying its debts as they became due. The court also determined, however, that the three petitioning creditors did not qualify to file an involuntary petition because their claims were in part contingent and in part subject to bona fide dispute. Based on that determination, the court dismissed the involuntary petition by order entered October 18, 2007. The present motion for reconsideration was filed on October 29, 2007.

---

[2] The court ruled that the evidence taken at the preliminary injunction hearing would be treated as part of the record for the trial of the involuntary petition.

Discussion

I.

Under Rule 59(e), Federal Rules of Civil Procedure, which is made applicable to bankruptcy proceedings by Rule 9023, Federal Rules of Bankruptcy Procedure, a court may alter or amend a final judgment or order on motion made within ten days after the order is entered on the docket.  Although Rule 59(e) does not set forth specific grounds for such relief, the Fourth Circuit has explained that relief is proper (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.  *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).  A Rule 59(e) motion is not proper, however, if it simply reiterates arguments already made and considered.  *Durkin v. Taylor*, 444 F.Supp. 879, 889 (E.D. Va. 1977) (stating that a Rule 59(e) motion is not "intended to give an unhappy litigant one additional chance to sway the judge.")  Since the present motion does not allege an intervening change in controlling law, the discovery of new evidence, or manifest injustice, the issue is whether a showing has been made that the court's ruling was predicated upon a clear error of law.

II.

The motion for reconsideration primarily focuses on the court's ruling that the claims of the petitioning creditors were in part contingent on the date the petition was filed.  A debtor may be put into bankruptcy involuntarily on a petition filed by three or more creditors, "each of whom is either a holder of a claim against such person that is *not contingent as to liability* or the subject of a bona fide dispute as to liability or amount . . . , if such *noncontingent*, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor

securing such claims." § 303(b)(1), Bankruptcy Code (emphasis added).[3]  Assuming the petitioners hold qualified claims, the petition for bankruptcy relief will be granted if the debtor is not generally paying its undisputed debts as they become due or if a receiver or other custodian has been appointed or has taken possession. § 303(h), Bankruptcy Code.

The petitioning creditors here put forward essentially two arguments: first, that the alleged contingency is based on an unenforceable agreement; and second, that even if the agreement is enforceable, the obligation is not "contingent" as that term is used in § 303 of the Bankruptcy Code but merely avoidable. Both arguments were previously made and were considered by the court in its oral ruling. For that reason alone, the court might justifiably deny the motion, since appeal, not a motion for reconsideration, is the appropriate remedy when a party simply disagrees with the trial court's legal analysis. Be that as it may, the court believes that some brief comment is nevertheless appropriate to address the issues the petitioning creditors have raised.

A.

The court will first address the issue of contingency. The salary and severance claims asserted by the petitioning creditors arise under a board of directors resolution in the case of Robert McNanley, Sr., and under written one-year renewable employment agreements in the case of Robert McNanley, Jr., and Elizabeth Crawford. The senior Mr. McNanley's salary was $100,000 per year, with the further provision that in the event his employment were terminated "for whatever reason including death or disability," the company would continue to pay his salary for one year. The younger Mr. McNanley's salary was $130,000 per year, and his

---

[3] If a debtor has less than 12 creditors, only a single petitioning creditor is needed. § 303(b)(2), Bankruptcy Code. There is no dispute that LCN has at least 12 creditors.

agreement provided that if he were terminated without cause, he was entitled to any "accrued but unpaid" base salary plus severance equal to one year base salary. Ms. Crawford's salary was the same as her brother's, but the severance if she were terminated without cause was six months of base pay. The evidence at trial showed that in early 2005 the company was in serious financial difficulty after losing its largest contract, and that at a meeting of the company's board of directors held on May 12, 2005, Ms. Crawford represented that she and her brother would each take a 30 percent pay deferral, and the senior Mr. McNanley would defer his pay in full, "until such time as the corporation has sufficient income to reinstate their salaries." Ms. Crawford's presentation was recorded in the minutes of the board meeting but was not formally acted upon by the board. Subsequent to the meeting, however, the elder Mr. McNanley received no salary and Ms. Crawford and the younger Mr. McNanley received reduced pay checks consistent with Ms. Crawford's recommendation.[4] The testimony at the trial established that the unpaid sums were carried as "accrued payroll"—although not as an account payable—on the company's records. The testimony further established that the company did not currently have sufficient income to pay the deferred salary but would have the ability if, as expected, a large claim it had filed against the United States government were successful.

The Bankruptcy Code itself does not define the terms "contingent" or "noncontingent" as they apply to claims. Case law, however, does provide guidance, with an often-quoted formulation being that of *In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr. S.D. Tex. 1980).

---

[4] At some point—and without the knowledge of the board of directors—$20,000 of the late Mr. McNanley's deferred compensation was paid to his widow and $30,000 of the younger Mr. McNanley's compensation was paid to him. According to the testimony at the trial, it was the disclosure of these payments by Ms. Crawford in a report to the board that precipitated her and her brother's termination, although neither was given written notice (as required by their employment agreements) that they were being terminated for cause.

In that case, the court explained that a claim "is contingent as to liability *if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event* and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *Id.* at 133. (emphasis added). The court distinguished a contingent claim from an avoidable claim by explaining that "if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent as to liability." *Id.* While the distinction may be somewhat elusive and difficult to apply in practice, the court is of the opinion that payment of the deferred salary in this case is more accurately characterized as a contingent rather than an avoidable obligation, for the simple reason that the deferred salary does not become payable unless and until a specific future event occurs, namely, the company achieving a cash flow sufficient to pay it. The fact that the company's current management has high hopes of that occurring does not, in the court's view, detract from the essentially contingent nature of the deferred payroll claim. Nor is the court persuaded that simply carrying the deferred pay on the company's records as accrued payroll is sufficient to render the payment obligation non-contingent.[5]

---

[5] As explained by one accounting handbook, even contingent liabilities must be recorded on a company's books in some circumstances:

> Notes on contingencies discuss the expected results of litigation and environmental issues, along with other contingent assets or liabilities.... Contingencies that are *reasonably possible* must be discussed in a note. Contingencies that can be *reasonably estimated* in amount and that are *probable* must be both recorded on the books and included in the financial statements.

Charles R. Wright, Understanding and Using Financial Data: An Ernst & Young Guide for Attorneys, 2d ed. (John Wiley & Sons, Inc., 1996), p. 53 (emphasis in original). To similar
(continued...)

The cases urged by the petitioning creditors are not to the contrary.  The first case, *National Fire Proofing Co., v. Bickford,* 141 Va. 706, 126 S.E. 668 ( 1925), dealt with the following issue: "Can one appoint an agent and say to him, either directly or by a course of dealing, that his commissions for work secured shall be a certain sum, and then when that work is about secured, notify him that his compensation has been reduced." 141 Va. at 712, 126 S.E. at 670.  The agent in that case, Bickford, was the local representative for National Fire Proofing Company, Inc., a manufacturer of hollow tile and other clay products.  After he negotiated sales—for which he had previously been allowed a commission of 80 cents per ton—to two local builders for the construction of new school buildings, the manufacturer advised him it was reducing its commission to agents to 60 cents per ton, and that on one of the jobs it was further reducing the commission to 40 cents per ton to take account of the low price it had to quote in

---

[5](...continued)
effect is the discussion in one of the available on-line dictionaries of accounting terms:

> [C]ontingent [L]iability
> A potential liability dependent upon some future event occurring or not occurring. For example, a company is named as a defendent [*sic*] in a $1 million lawsuit. Does that mean the company automatically has a liability of $1million? What if the lawsuit has no merit and can easily be defended? If it is probable that the company will lose and the amount can be estimated, a journal entry is prepared to debit Loss from Lawsuit and to credit Lawsuit Payable. If it is possible but not probable that the company will lose, the journal entry is not made but instead there will be a footnote disclosure. If the lawsuit is remote (a nuisance suit without any merit), there is no need for a journal entry and no need to disclose the lawsuit. Accountants usually consider product warranties to be a contingent liability that is both probable and can be estimated and is therefore recorded with a journal entry.

http://www.accountingcoach.com/accounting-terms/accounting-dictionary/accounting-terms-C.html (visited 12/31/07).

order to obtain the sale. When sued by the manufacturer for the cost of the tile, Bickford claimed a credit for a commission of 80 cents per ton, which the jury allowed in reaching its verdict. The manufacturer appealed, but the Supreme Court of Appeals of Virginia affirmed the verdict and held:

> After the agent had done all that, from the course of their dealings, could have been expected from him, this principal had no more right to cut his commissions than he had to discharge him.... [H]ere the agent was the procuring cause of the contract; he had already earned his compensation and it was not then in the power of his principal, without his consent, to deprive him of it or to reduce the amount thereof. Eighty cents per ton had been the compensation to him before these contracts had been taken up and he had the right to assume that this compensation would be continued.

141 Va. at 713, 126 S.E. at 670 (internal citations omitted). As should be apparent from the foregoing summary, the circumstances in *National Fire Proofing* bear little if any relationship to those presented in this case. *National Fire Proofing* involved an attempt to reduce compensation, involuntarily and after the fact, for services *already* performed, while the present case involves a voluntary agreement to accept reduced compensation for *future* services, with a catch-up or make-whole provision at such time as the company's finances permitted.

The other case cited by the petitioners, *American Aircraft Engineering Corp. v. Melton*, 211 Va. 562, 179 S.E.2d 465 (1971), while somewhat closer to the present facts, is nevertheless distinguishable. In *American Aircraft*, the employee had a written agreement under which he was entitled to compensation in the amount of $15,000 per year, of which $12,000 was to be paid as salary at the rate of $1,000 per month, while $3,000 was to be paid as a bonus "at such times and in such amount *during the . . . one-year term* as may be convenient to the [employer]." 211 Va. at 562, 179 S.E.2d at 466 (emphasis added). The employment was terminated after 8 ½ months (and presumably before any bonus had been paid), and the issue was whether the

employee was entitled to compensation for those months based on $15,000 per year or $12,000 per year. The Supreme Court of Appeals affirmed the trial court's ruling that the employee was entitled to receive compensation at the rate of $15,000 per year. In so holding, the Court stated,

> The contract differentiates between salary and bonus *not respecting accrual, but respecting times of payment*. The contract apparently contemplates that both salary and bonus shall accrue from day to day during [the employee's] employment, for nothing is said to the contrary. . . . Whether or not the company could have been required to pay the accrued bonus when [the employee] quit his employment,...it was obligated in any event to pay the accrued bonus by [the end of the contract year].

211 Va. at 563, 179 S.E.2d at 466 (emphasis added). A crucial difference between the employment agreement in *American Aircraft* and the salary deferral here is that, while the employer in *American Aircraft* had flexibility as to when, during the year, the $3,000 bonus would be paid, it nevertheless had to be paid by the end of the contract year. The running of the contract year was by no means an uncertain event; by the very nature of things, it was bound to occur. Here, by contrast, the salary deferral was open-ended, and any catch-up obligation would not become fixed until the occurrence of an uncertain future event, namely a sufficient improvement in the company's cash flow.

B.

The petitioning creditors strenuously urge, however, that the deferral arrangement provides no basis for characterizing their claims as contingent because any alleged agreement to accept less than the full salary provided for by board resolution (in the case of the senior Mr. McNanley) or by the written employment agreements (in the case of Ms. Crawford and the junior Mr. NcNanley) was never embodied in a writing signed by the affected parties and is therefore unenforceable. On this point, the court—while expressly not making a final ruling—is

9

inclined to find that the petitioners are not likely to succeed on this aspect of their claims.[6]  From the testimony, it seems clear that Ms. Crawford's representation that her father was willing to defer all his salary, and she and her brother to defer 30 percent of theirs, was made not only voluntarily and with the knowledge and consent of her father and brother, but, more importantly, to enable the company's financial survival.  Without the salary deferral, the company might well have been forced to shut its doors, which would not only have left the younger Mr. McNanley and Ms. Crawford without jobs, but would have rendered any stock the senior Mr. McNanley held in the company worthless.  Preserving their own jobs and the value of the company was clearly something of value and would likely, in the court's view, constitute adequate consideration for the salary deferral.  To the extent a state court disagrees and enters judgment for the petitioning creditors for the unpaid salary, they will obviously have the right at that time to refile their involuntary petition.

O R D E R

For the foregoing reasons, it is

**ORDERED:**

    1.  The motion for reconsideration is denied.

---

[6] The trial of an involuntary petition is not generally an appropriate procedural context in which to try complex factual or legal issues going to the merits of disputed claims. During the "gap" period between the filing of an involuntary petition and its adjudication, both the debtor and creditors are in something of a legal limbo, and there is a need for a prompt ruling as to whether the debtor should or should not be in bankruptcy. For that reason, the court, in its oral ruling, addressed the enforceability of the salary deferral in the same way it would address a motion for a preliminary injunction, namely whether the petitioning creditors had shown a substantial likelihood that they would succeed on the merits of their position. The ruling was not intended as a final adjudication on the merits, nor was it intended to preclude the petitioners from asserting an immediate right to payment in connection with any state court litigation between the parties.

      2.  The clerk will mail a copy of this order, or give electronic notice of its entry, to the parties listed below.

Date: _____                  _____
                                                                         Stephen S. Mitchell
Alexandria, Virginia                               United States Bankruptcy Judge

Copies to:

Linda D. Regenhardt, Esquire
Gary & Regenhardt PLLC
8500 Leesburg Pike, Suite 7000
Vienna, VA  22182-2409
Counsel for the petitioning creditors

Richard J. Stahl, Esquire
Stahl, Forest & Zelloe P.C.
11350 Random Hills Road, Suite 700
Fairfax, VA  22030
Counsel for the debtor

Frank Bove, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314